**UNITED STATES of America,**
**Plaintiff,**

v.

**TATE & LYLE NORTH AMERICAN**
**SUGARS, INC., Defendant.**

**No. 97 Civ. 9113(RMB).**

United States District Court,
S.D. New York.

Aug. 24, 2001.

Sheila M. Gowan, Ramon Reyes, U.S. Attorney's Office, New York City, for plaintiff.

Jonathan Jackel, Forbes Maner, Burt, Maner & Miller, Washington, DC, Mark Davidson, Proskaue, Rose LLP, New York City, for defendant.

## *ORDER*

BERMAN, District Judge.

Plaintiff, the United States of America ("Plaintiff" or the "IRS" or the "Government"), filed this action on or about December 10, 1997 to recover a $1,526,100.60 interest payment it erroneously made to defendant, Tate & Lyle North American Sugars, Inc. ("Defendant" or "Tate & Lyle,")[1], on or about September 24, 1993. Amstar seeks summary judgment, pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56, asserting that the payment to Amstar was proper, and, in any event, the Government's claim for recovery was asserted too late and is barred by the (two year) statute of limitations set forth in 26 U.S.C. § 6532(b).

**For the reasons set forth below, Amstar's motion for summary judgment is denied.**

---

1. The funds were paid to Domino Sugar Corporation, as successor in interest to Amstar Sugar Corporation ("Amstar"). Domino has changed its name to Tate & Lyle North American Sugars, Inc. (Answ.¶ 1). Tate & Lyle is the parent company of Amstar.

## I. Background

In 1990, the Internal Revenue Service ("IRS") audited Amstar for the tax period ended August 16, 1989 (the "8908 return"). (Compl.¶ 16). To facilitate the audit, Tate & Lyle gave the IRS use of an office in the Decatur, Illinois building of A.E. Staley ("Staley"), one of the subsidiaries of Tate & Lyle. (Government's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Gov't Opp.") at 2). Bill Carnie, the director of taxes for Tate & Lyle, and his assistant, Martha Hoyt, were responsible for the coordination of the audit with the IRS. (Gov't Opp. 4–5).[2] Among other things, the IRS reviewed Amstar's August 1989 tax return and, on August 28, 1990, proposed a tax adjustment relating to an $18,009,489.00 net operating loss carry forward that Amstar claimed as a deduction. (Compl.¶ 17). In early November 1990, Bill Carnie appointed Jared Twenty as the new tax director for Tate & Lyle. (Gov't Opp. at 5). Though Mr. Twenty does not recall specific discussions about the proposed adjustment, Twenty said that because of his position, he "had to have participated [in the audit] in some way." (Deposition of Jared Twenty dated January 11, 2000 ("Twenty Dep.") at 69). In December 1990, Defendant agreed in writing to the IRS's proposed adjustment. (Compl.¶ 18).

On December 14, 1990, Defendant sent the IRS a letter concerning the proposed adjustment and enclosing a remittance of $6,497,710.00 ("December 1990 remittance"). (Gowan Decl., Ex. 25; Exhibits to Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.Ex.") OO). In its letter, Defendant stated that the remittance was for an (anticipated) deficiency in tax, plus interest, resulting from the IRS' adjustment.[3] (Gowan Decl., Ex.25). Defendant's letter stated that "[w]e respectfully request that this deposit be identified as a **cash bond** in your records." (*Id.*) (emphasis added). Pursuant to Revenue Procedure 84–58, 1984–2 C.B. ("Rev.Proc.84–58") at 503, § 5.02, Amstar's remittance had the effect of stopping interest from accruing on any tax deficiency assessment. (Compl.¶ 21).

On December 14, 1990, in accordance with Amstar's instructions, the IRS prepared a Payment Posting Voucher, which identified the remittance as a "cash bond" and indicated that a Form 316(C)[4] should be sent to Amstar. (Compl.¶ 23). In the final Payment Posting Voucher, the IRS typed the letter "X" in the box adjacent to the words "Cash Bond" and the letter "X" in the box adjacent to the words "Send 316(C)"; however, the IRS also typed the amount of the remittance, $6,497,710, be-

---

2. Amstar, itself, had tax counsel in New York named Harvey Friedman. Mr. Friedman confirmed that individuals at the Tate & Lyle tax department in Decatur, Illinois, specifically Mr. Carnie and Ms. Hoyt, were responsible for "dealing with the IRS" with respect to the audit. (Deposition of Harvey Friedman dated December 30, 1999 ("Harvey Dep.") at 83).

3. The letter reads as follows:

"Enclosed is the above referenced Notice of Proposed Adjustment, executed by an officer of Amstar [ ]. The taxpayer has agreed to the adjustment and herewith encloses a check in the amount of $6,497,710 in payment of the deficiency in tax, plus interest, resulting from

this adjustment. The tax was computed using the 34% statutory rate, and interest has been calculated for the period from June 15, 1990 through December 14, 1990. We respectfully request that this deposit be identified as a cash bond in your records." (Gowan Decl., Ex. 24).

4. A Form 316(C) is a letter that is sent to notify the taxpayer that the IRS received an advance payment and will accept the remittance as a cash bond. (Gowan Decl., Ex. 52 at 10). There is no record that a Form 316(C) was sent in this case and no such document has been located. (Gov't Opp. at 27). *See* discussion, *infra* at 13.

side the designation "Code 670," the code which is used by the IRS to indicate that a remittance is a "subsequent payment."[5] (Declaration of Sheila M. Gowan dated October 6, 2000 ("Gowan Decl."), Ex.27).

In September 1993, the IRS issued a Revenue Agent's Report ("RAR"), concluding its audit of the 8908 return. The IRS determined that, as a result of other adjustments in Amstar's favor, Amstar's correct tax liability for the period at issue was less than the amount originally shown in Amstar's tax return and, consequently, also less than the approximately $10 million tax payment that Amstar had made when it filed its return. (Compl.¶ 25). The IRS concluded that Amstar had overpaid its taxes by $173,336.00. (Gowan Decl., Ex.31). In calculating Amstar's correct tax liability (and overpayment), the IRS did not take into account Amstar's December 1990 remittance. (Compl.¶ 26).

On September 24, 1993, the IRS sent Amstar $8,240,206.34 including: (i) the $173,336.00 refund (minus $7,956.61 which was credited to other tax liabilities owed by Amstar), together with interest in the amount of $51,016.35; and (ii) the December 1990 remittance (i.e., $6,497,710.00) together with interest thereon in the amount (at issue here) of $1,526,100.60. (Def.Ex. UU; Compl. ¶¶ 30–31).

On January 25, 1996, Rosie Williams, a case manager at the IRS, met with Annie Harris, the Tate & Lyle tax director,[6] and informed Harris that the IRS had mistakenly paid interest on the "cash bond." (Gowan Decl., Ex. 37; Gov't Opp. at 14).[7] The IRS contended that the $1,526,100.60 interest payment that it made to Amstar (relating to the December 1990 remittance) was a **mistake, i.e., the result of a processing error, because the remittance was made as a cash bond.** (Gov't Opp. at 14; Compl. ¶ 33). By letter dated March 14, 1996, Defendant advised the IRS that it would not return the $1,526,100.60. (Gowan Decl., Ex.40).[8]

By Decision and Order dated September 13, 1999 ("Decision and Order"), this Court denied Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and held that "the circumstances surrounding [Amstar's] December 1990 remittance need to be explored further" and "[d]iscovery concerning the . . . remittance is appropriate." (Decision and Order at 9). In the instant motion for summary judgment Defendant argues that, among other things, it made a "payment"—not a cash bond—to the I.R.S. on December 14, 1990, and was, therefore entitled to the interest that the Government paid when that payment was refunded on September 28, 1993.

## II. Standard of Review

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the

---

5. The box adjacent to the designation "Code 640," the code which is used by the IRS to indicate an "advance payment on deficiency," was left empty. (Gowan Decl., Ex. 27).

6. Ms. Harris was appointed to succeed Mr. Twenty as the director of taxes at Tate & Lyle in 1991. (Gowan Decl., Ex. 9 at 77).

7. Rev.Proc. 84–58 at 503, § 5.04 provides that a taxpayer who makes a deposit payment to the IRS in the nature of a cash bond is not entitled to receive interest on the deposit in the event that the IRS returns the cash bond

to the taxpayer. (Appendix of Certain Materials Cited in Memorandum In Support of Defendant's Motion for Summary Judgment ("Def.App.") tab A).

8. Defendant's letter dated March 14, 1996 did not dispute that its December 1990 remittance was a cash bond: "We did not then, and we do not now, consider the September 1993 refund to be a return of the cash bond paid for the erroneous use of the NOL carryforward." (Gowan Decl., Ex. 40).

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed. R.Civ.P. 56(e)); *accord Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir.1993). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223.

## III. Analysis

### A. Interest Payment or Cash Deposit

The IRS has a procedure outlining how it will treat remittances from taxpayers. *See* Rev.Proc. 84–58. Interest runs on tax liabilities from the time they are due until they are paid. 26 U.S.C. § 6601. Taxpayers are permitted to make (advance) deposits in the nature of a "cash bond" for the purpose of tolling the accrual of interest and penalties on potential tax deficiencies. *See* Rev.Proc. 84–58 at 501, § 1. A taxpayer is not normally entitled to recover interest on a deposit in the nature of a cash bond. *See* Rev.Proc. at 503, § 5.04 ("[n]o interest will be allowed or paid on a deposit, or any portion of a deposit, returned to a taxpayer before or after assessment"); *see also Busser v. United States*, 130 F.2d 537, 538 (3d Cir.1942) (the Government "is not liable for interest unless there is a statutory requirement or a contract to pay it").[9] A taxpayer may choose to remit a cash bond "even if [it] means forfeiting the right to interest on an overpayment—in order to preserve jurisdiction in the Tax Court [to challenge an assessment], which depends on the existence of a deficiency [citation omitted], a deficiency that would be wiped out by treatment of the remittance as a payment." *Baral v. United States*, 528 U.S. 431, 439 n. 2, 120 S.Ct. 1006, 145 L.Ed.2d 949 (2000).

This case turns on the nature of the December 1990 remittance. Amstar contends that under the "facts and circumstances" test outlined by the U.S. Court of Appeals for the Second Circuit in *Ertman v. United States*, 165 F.3d 204, 208–09 (2d Cir.1999), the remittance made by Amstar was a payment, not a deposit in the nature

---

**9.** A payment of interest, unlike a "cash bond," is returned with any additional interest earned on the amount. *See* 26 U.S.C. § 6611.

of a cash bond. (Def.Mem. at 3–15). Applying the same "facts and circumstances" analysis, the IRS asserts that the 1993 payment was a deposit in the nature of a cash bond. (Gov't Opp. at 23–28).

■ The distinction between an (advance) deposit of tax and a payment of tax is a judicial construct stemming from the U.S. Supreme Court's decision in *Rosenman v. United States*, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1945). A taxpayer who makes a deposit payment to the IRS is not entitled to receive interest on the deposit in the event that the IRS returns the cash bond to the taxpayer; on the other hand a taxpayer who makes a payment is entitled to any interest earned on that amount in the event that the payment is returned. *See* Rev.Proc. at 503, § 5.04; 26 U.S.C. § 6611. In evaluating whether a remittance is a deposit or a payment, the Court of Appeals for the Second Circuit has rejected the so-called "per se" test.[10] The Court of Appeals, instead, examines the facts and circumstances surrounding the payment to determine the character of the remittance. *See Ertman*, 165 F.3d at 208–09. This involves analysis of: (i) the timing of the assessment or definition of the tax liability; (ii) the taxpayer's intent with respect to the remittance; and (iii) the IRS's treatment of the remittance upon receipt. *Id* at 207.

At first blush, it would appear that the "facts and circumstances" test would generally require a trial to make the fact-specific inquiry that the test entails. And yet a significant number of courts (including courts in jurisdictions that have expressly adopted the "facts and circumstances" test . . .) have held that certain types of remittances can categorically be deemed payments.

*Id.*

### 1. Timing of the Assessment or Definition of Tax Liability

■ Amstar claims that its tax liability was "well defined at the time it made its remittance" to the IRS. (Def.Mem. at 4). Amstar contends that its remittance was a payment because, *inter alia*, Amstar made precise calculations to determine the amount of the tax due, rather than simply making a lump sum payment. (*Id.* at 4–5, 8–9). The IRS counters that remittances made by a taxpayer and designated as cash deposits *prior to the issuance of a notice of deficiency* are treated as cash deposits. (Gov't Opp. at 16); *see also* Rev. Proc. 84–58 at 502, § 4.02 ("**A remittance made before the mailing of a notice of deficiency that is designated by the taxpayer in writing as a deposit in the nature of a cash bond will be treated as such by the [IRS].**").

At the time of payment by Amstar, by check dated December 13, 1990, Amstar had received a Notice of Proposed Adjustment ("NOPA") from the IRS, dated August 28, 1990. (Gowan Decl., Ex. 14; Def.

---

**10.** Under the "per se" test, a remittance is a payment only when the actual tax that is due has been determined at the time it is paid. *See United States v. Dubuque Packing Co.,* 233 F.2d 453, 460 (8th Cir.1956) ("We think the further declarations of the Supreme Court in the Rosenman case establish that the District Court [here] was right in holding that the time when the deficiencies were paid in this case and the statute was started running against the claims for refund was when the assessments were made and the amounts held in the suspense account were applied."); *Thomas v. Merchantile Nat'l Bank,* 204 F.2d 943, 944 (5th Cir.1953) ("Until the Commissioner certified the assessment . . . there was no deficiency assessment, and no liability on the part of the taxpayer, and consequently nothing to pay. The sum deposited with the Collector . . . was merely an advance deposit to cover additional tax liability expected to arise thereafter.").

Mem. at 4–5).[11] Amstar's remittance was sent before the IRS had audited Amstar's 8908 return, issued a notice of deficiency, or otherwise assessed tax liability. The fact that an assessment had not yet been made suggests—but is not conclusive of the conclusion—that the 1990 remittance was a deposit rather than a payment. See, e.g., *Crosby v. United States*, 889 F.Supp. 143, 146–47 (D.Vt.1995).

### 2. Amstar's Intent

■ The cover letter accompanying the remittance check to the IRS states: "**We respectfully request that this deposit be identified as a cash bond in your records.**" (Gowan Decl., Ex. 24). Amstar seeks to diminish the significance of its (own) language by claiming that "Mr. Twenty's letter was simply a cover letter for the check" and "Mr. Twenty was not authorized to waive interest for Amstar." (Def.Mem. at 11). Amstar also asserts that circumstantial evidence would demonstrate an intent to make a payment of tax because Amstar: (i) did not remit the money under protest; (ii) deducted the interest remitted from the tax return for the period covered by the December 1990 remittance; (iii) did not "dump" a large sum on the IRS; (iv) did not request "deposit treatment"; and (v) made a claim for a refund. (Def.Mem.6–12). The IRS counters that Twenty's words make it "crystal clear" that Amstar intended the remittance to be a cash deposit, and that Mr. Twenty, as director of the tax department at Tate &

Lyle, Amstar's parent corporation, was authorized to speak on behalf of Amstar. (Gov't Opp. 18–22, 24). The IRS also argues that none of the circumstantial evidence factors Amstar raises is dispositive.

■ The Court is in accord with the Government. "The Court agrees with those courts and commentators that place significant weight on the intent of the taxpayer when resolving disputes over the nature of a cash remittance." *See Crosby*, 889 F.Supp. at 147 (citations omitted); *see also Ertman*, 972 F.Supp. at 708 ("The taxpayer's intent is the ultimate question."). "Whether a given intent existed is generally a question of fact," appropriate for resolution by the trier of fact. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 194 (2d Cir.1998); *see Securities and Exchange Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996) ("Whether or not a given intent existed, is, of course, a question of fact."). The clearest indication of Amstar's intent is found in Jared Twenty's letter. While Mr. Twenty may not have had power of attorney,[12] it is not clear to the Court that, as Defendant contends, a power of attorney is required in order for an individual lawfully to instruct the IRS on how to treat a remittance. *See* 26 C.F.R. § 601.504(a) (enumerating the specific situations in which a power of attorney is required to act on behalf of a taxpayer); *see generally* Rev. Proc. 84–58. The relevant inquiry is whether Twenty had authority to bind Amstar.[13]

---

**11.** A notice of proposed adjustment advises the taxpayer that the IRS has spotted an issue; the taxpayer may either agree or disagree with the IRS's evaluation. (Gov't Opp. at 17, n. 12 (citing Gowan Decl., Ex. 7 at 81–82)).

**12.** The IRS does not contest the fact that no power of attorney was ever signed by an officer of Amstar giving Twenty authority to act for Amstar.

**13.** The Government asserts several theories of agency law to support its position that Twenty had authority to bind Amstar, including actual authority, apparent authority, and ratification. Assessing the record and drawing all reasonable inferences in the light most favorable to the Government (non-movant), *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000), the Court finds that there may be sufficient evidence for a jury to find au-

To recover on a theory of apparent authority, Plaintiff must prove that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representation of the agent." *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir.1991) (citations omitted); *see also Lehman Bros. v. Tutelar CIA Financiera*, 1997 WL 403463, at *4 (DC) (S.D.N.Y. Jul.17, 1997). Here, the Court cannot find, as a matter of law, that there was not apparent authority. Amstar's senior tax counsel in New York, Harvey Friedman, and its treasurer, Joseph Kelly, confirmed that the procedure for dealing with the IRS was through the Tate & Lyle tax department. (Gowan Decl., Ex. 8 at 83–84; Ex. 2 at 49).[14] Carnie, the director (before Twenty) of the Tate & Lyle tax department, said the IRS dealt directly with Tate & Lyle because the individuals at Amstar were not authorized to do so. (Gowan Decl., Ex. 5 at 59). Further, "[t]he entire audit of the 8908 return was handled by the Tate & Lyle tax department, and Ann Harris, Twenty's successor, confirmed that the IRS was instructed to deal with her. . . . This too had been the practice of Twenty, who specifically instructed the IRS *not* to contact 'subsidiary personnel on any issue.'" (Gov't Opp. at 22). Twenty's letter, accompanying the December 1990 remittance, was sent (by facsimile) to: (i) Harvey Friedman, Amstar's senior tax counsel, and (ii) Burt, Maner & Miller ("BM & M"), the law firm that Tate & Lyle retained with regard to the audit issues. (Gowan Decl., Exs. 25, 41). "Hoyt [Twenty's assistant] did not hear from Friedman or BM & M about the fax, nor did anyone ever tell her that there was anything wrong with the Twenty letter, or that it incorrectly stated that Amstar wanted the payment treated as a cash bond." (Gov't Opp. at 9). It seems reasonable that the IRS would conclude that Twenty had (apparent) authority to designate the remittance as a cash bond. Moreover, "[t]he existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *See Minskoff v. American Express Travel Related Svcs. Co.*, 98 F.3d 703, 708 (2d Cir.1996).

Defendant contends that the Court should disregard Twenty's letter and, instead, consider circumstantial evidence which demonstrates Amstar's intent not to treat the remittance as a cash deposit. "Amstar did not remit the money under protest, it deducted the interest it paid, it remitted exactly what was due, it did not request deposit treatment, and it made a statutory refund claim to get its money back." (Def.Mem. at 6). The Court is not persuaded that these factors demonstrate, as Defendant alleges, Amstar's intent to make a payment. For example, the fact that Amstar remitted exactly the amount due (as opposed to making a lump-sum payment) could indicate that Amstar wanted to ensure that the remittance covered all potential tax and interest that would

---

thority under any one of these theories. However, for purposes of the instant motion, the Court has chosen to analyze the law of apparent authority.

14. Kelly gave deposition testimony that the Tate & Lyle tax department was "dealing directly with the IRS on the Decatur site and communicating with them regarding our notices of proposed adjustment or information about document requests and passing the information back and forth." (Gowan Decl., Ex. 2 at 84). "[Amstar] did rely on [the Tate & Lyle tax group] to communicate with the IRS." *Id.* at 50. When asked whether Twenty was authorized to execute documents on behalf of Amstar, Kelly answered: "I don't remember. He may have been." *Id.* at 86.

have accrued as a result of its failure to pay the correct tax in the tax return dated June 15, 1990. Revenue Procedure 84–58 instructs the taxpayer to do just that, i.e. provide a remittance for both the tax and interest accrued, when making **either** and advance payment or a cash bond. *See* Rev.Proc. 84–58 at 503, § 5.02. The fact that Amstar subsequently deducted the interest amount is not dispositive of its intent. *See, e.g., New York Life Ins. Co. v. United States,* 1995 WL 817955, at *2 (Fed.Cl.), *aff'd,* 118 F.3d 1553 (Fed.Cir. 1997) (affirming decision that remittance was a cash bond notwithstanding, *inter alia,* that the interest portion of the remittance had been deducted on tax return). And, in 1996, after the alleged "mistake" was uncovered and the IRS asked to have the money paid back, Harris, then director of the Tate & Lyle tax department, sent a draft response letter to BM & M for review stating that no mistake had been made because "the IRS should have calculated interest without any regard to the **cash bond paid** for misuse of the NOL." (Gowan Decl., Ex. 39) (emphasis added).

### 3. IRS's Treatment of the Remittance

■ Defendant claims that the IRS treated Amstar's remittance as a payment. As support, Defendant states that the IRS: (i) "did not put the money in a suspense account," [15] (ii) "allowed Amstar to deduct the interest it paid," (iii) "did not send a Letter 316(C)," and (iv) maintained an internal account reflecting that the remittance was a payment.[16] (Def.Mem. at 12).

The Government contends that it did, in fact, treat the remittance as a cash bond, and that, in any event, Amstar's contentions are either irrelevant or unfounded. (Gov't Opp. 10–11, 26–28). The Government offers evidence that: (i) since at least June 1977, i.e. when the IRS began using the Automated Data Processing system, cash bonds have not been kept in separate accounts (Gowan Decl., Ex. 28 and errata sheet); (ii) there is no evidence the IRS ever audited Amstar's deduction for the remittance payment or otherwise "allowed" the deduction; (iii) whether or not a Letter 316(C) was actually sent is a disputed fact issue and, relatedly, at least two internal IRS documents reflect that the remittance was classified as a "CASH BOND" and that a Letter 316(C) was to be sent (Gowan Decl., Exs. 26, 27); and (iv) the remittance was assigned a special document locator number ("DLN") within blocking series 999, the (same) blocking series used by the IRS to denote a cash bond (Gowan Decl., Ex. 25 at 10–13, Ex. 27). The nonmoving party here has met its burden and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Statute of Limitations

■ Amstar contends that because the IRS sent Amstar a payment on September 24, 1993, but did not commence litigation to recover (a portion of) that payment until December 1997, the Government has exceeded the two year limitations period set

---

**15.** The Government endorsed the check "For Credit to the TREASURER OF THE UNITED STATES ... in Payment of an Obligation to the United States." (Def.Ex.OO) (emphasis in original).

**16.** Deposits are designated on IRS forms with a 640 transaction code; payments appear

with a 670 transaction code. Amstar's December 1990 remittance received a 670 transaction code. The Government claims that "[t]he IRS secretary ... who was new at her job, made one crucial mistake" and "entered an incorrect transaction code on the paperwork." (Gov't Opp. at 26).

forth in 26 U.S.C. § 6532(b).[17] The Government counters that, "when money remitted to the IRS is a cash bond as opposed to a payment of tax, the refund claim provisions, and accordingly the statute of limitations provisions of the Internal Revenue Code, do not apply." Gov't Opp. at 28 (citing *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1555–59 (Fed.Cir.1997)). The IRS asserts that the Government has the right to sue to recover funds that it has erroneously or wrongfully paid at any time. (Gov't Opp. at 28–30).

"The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." *United States v. Wurts*, 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938) (internal citation omitted). The United States Supreme Court has ruled that "[o]rdinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time." *Id.* at 416, 58 S.Ct. 637; *see also United States v. Hawk Contracting, Inc.*, 649 F.Supp. 1, 2 (W.D.Pa.1985) ("[t]his rule is intended to preserve the public's rights, revenues, and property from injury and loss due to the negligence of agents of the government") (internal citation omitted). Moreover, "[t]he Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has clearly manifested its intention to raise a statutory barrier." *Wurts*, 303 U.S. at 416, 58 S.Ct. 637.

The timeliness issue here turns on the characterization of the 1990 remittance. Amstar argues: "The record in this case uniformly shows that the I.R.S. determined that Amstar had an overpayment of tax, that the I.R.S. carefully processed that overpayment, and that the I.R.S. made a refund with interest because it determined there was an overpayment." (Def.Mem. at 16). Amstar **assumes** that the 1990 remittance was meant to be, and in fact was, a payment of tax. For the reasons already stated, *supra* at Sec. III. A., whether the 1990 remittance was in the nature of a payment of tax or a deposit in the nature of a cash bond is a question of fact for a jury to decide. Summary judgment is, therefore, denied on the statute of limitations question as well.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is denied. The parties are directed to appear at a scheduling conference with the Court on September 4, 2001, at 11:30 a.m., in Courtroom 706 of the U.S. Courthouse, 40 Centre Street, New York, New York. **The parties are encouraged to engage in good faith settlement negotiations prior to the conference with the Court.**

17. Section 6532(b) provides as follows:

(b) Suits by United States for recovery of erroneous refunds.—

Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact.